JAMES BELL, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Bell v. Commissioner
Docket No. 1210-75.
United States Tax Court
T.C. Memo 1976-179; 1976 Tax Ct. Memo LEXIS 225; 35 T.C.M. (CCH) 787; T.C.M. (RIA) 760179; June 8, 1976, Filed Joseph I. Stone, for the petitioner. Richard M. Campbell,l, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined a deficiency in petitioner's income tax for the calendar year 1971 in the amount of $96,900.24 and an addition to tax for negligence under section 6653(a), I.R.C. 1954, [1] in the amount of $4,845.01. The issues for decision are: (1) Whether petitioner realized taxable income from gambling in the amount of $146,740 or any portion *226 thereof in excess of the amount reported on his Federal income tax return for 1971, and (2) whether respondent properly disallowed deductions claimed by petitioner for real estate taxes, state and local gasoline taxes, general sales tax, state and local income taxes, home mortgage interest and attorney fees for lack of substantiation. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioner was a legal resident of New York, New York at the time his petition in this case was filed. He filed an individual Federal income tax return for the calendar year 1971. Petitioner was convicted of fraudulently attempting to evade or defeat his income taxes for the calendar years 1960 and 1961 under section 7201 and willfully failing to file an income tax return for the calendar year 1962 under section 7203. During the year here in issue petitioner was a "pickup man" in a numbers operation. He had been engaged in this occupation for some time. In addition, petitioner worked at a laundromat on Eighth Avenue in New York, New York. As a pickup man for a numbers operation, petitioner would contact approximately 15 to 20 "runners" and take the slips *227 showing the numbers selected and the names of the purchasers to whom the runners had sold chances during the morning. These slips would be in a sealed envelope with the name or some designation to identify the name of the runner. Petitioner would deliver the 15 or 20 envelopes he picked up to an individual referred to as "the drop." The drop would take the envelopes of petitioner and other pickup men to "the bank" where a "ribbon" would be made indicating the total amount due from each runner. On the day following the day that slips were picked up, and usually at the same time that petitioner picked up slips for the current day, he would give the ribbon to the runner and the runner would give him the amount shown on the ribbon as due the bank for the previous day minus the 25 percent commission kept by the runner for making sales. Winning numbers were determined based on results at the Belmont track and generally would be published in a daily newspaper in New York. Bets would range from as little as 5 or 10 cents to as much as $1 or $2, or sometimes $5, by the individual betters. Generally, each individual runner would turn over somewhere between $30 and $40 to petitioner each *228 day from bet collections they had made. Sometimes, if bets were small, the amount would be less than $30 from a particular runner and occasionally the amount from a runner might be more than $40. The amounts which petitioner collected from the runners were always in small bills or in coins. When a number"hit," the bank paid the better on the basis of 600 to 1. Therefore, if a person who had bet $1 won, he would be due $600 by the bank less the runner's percent of the win. Petitioner, as the pickup man, would, when a number received from one of the runners from whom he collected won, take to the runners in large bills the amounts to pay off any winning ticket. Petitioner considered himself an employee of the bank. At times, petitioner would be sent by the bank to change small bills into large bills so that the bank might use the large bills as needed to pay off wins. Petitioner has a number of times been convicted for violation of state or local gambling laws because of being arrested carrying papers which could be identified as connected with the numbers operation. During the year 1971, Bankers Trust Company, 1770 Madison Avenue, New York, New York reported to the Internal *229 Revenue Service on Revenue Service Forms TCR-1 of the U.S. Treasury Department, currency transactions of petitioner James Bell. On these reports, petitioner's business, profession, or occupation was listed as "unknown." The following transactions were reported: DESCRIPTION OF TRANSACTIONS Nature of Transactions
U.S. Currency Involved
(State whether deposit, withdrawal,
Total
Amount in Denominations
exchange of currency, cashing or Date
Amount
of $100 or Higher
purchase of check, etc.)
2/5/71
$15,000
Exchange of currency --- small bills for large bills
( $50's and $100's)
2/16/71
$10,000
Exchange of currency --- small bills for large bills
( $50's and $100's)
2/26/71
$10,000
Exchange of currency --- small bills for large bills
( $50's and $100's)
3/3/71
$ 7,200
Exchange of small bills for large bills
( $50's and $100's)
3/18/71
$10,000
Exchange of small bills for large bills
( $50's and $100's)
3/25/71
$19,960
Purchased Official check with small bills.
4/28/71
$10,000
Exchange of small bills
($5.00 & $10.00) for large bills ( $50 & $100)
5/10/71
$20,000
Exchange of small bills
($5.00 & $10.00) for large bills ( $50 & $100)
5/20/71
$25,000
Exchange of small bills
($5.00 & $10.00) for large bills ( $50 & $100)
9/71
$39,720
Exchange of small bills for large bills
(50s & 100s)
*230 On the report made for the month of February, under Additional Information, appeared the following: "James Bell has personal checking account at this office." It is customary for the cashier at Bankers Trust Company to only exchange a large amount of small currency for large currency for an individual who has an account at the bank. Records of these transactions are made daily and these records are kept until they are transferred to the monthly report made to the Internal Revenue Service. The copies of these monthly reports are retained by the bank as the official bank record of the transactions. The daily records are considered by the bank as memoranda and not the permanent records of the bank. Therefore, after the monthly report is made to Internal Revenue Service and the copy of that report placed in the bank's files, the daily records are destroyed. The parties have stipulated that petitioner is entitled to a deduction of $1,016.61 for real estate taxes out of the $4,415.77 claimed. In 1971, petitioner paid to an attorney $300 for advice with respect to his income tax. In 1971, petitioner was paid $3,900 for his work at the laundromat. Out of this $3,900 the amount *231 of $106 was withheld for New York state income tax and $61 was withheld for New York city income tax. Petitioner had a mortgage on property he owned in Liberty, New York on which he paid interest in 1971 in the amount of $39.64. On his income tax return for 1971, petitioner deducted $286.64 as general sales tax which he computed from the tax tables on the basis of the income he reported. On his tax return for 1971, petitioner, under Miscellaneous income, reported $20,140 with the designation "Gambling." Respondent in his notice of deficiency to petitioner determined that petitioner had unreported income of $146,740 on the following basis: During the year 1971 you exchanged small denominations of currency for larger denominations at Bankers Trust Company in the following amounts: February 5, 1971
$ 15,000
February 16, 1971
10,000
February 26, 1971
10,000
March 3, 1971
7,200
March 18, 1971
10,000
March 25, 1971
19,960
April 28, 1971
10,000
May 10, 1971
20,000
May 20, 1971
25,000
September 1971
39,720
$166,880
Less: Gambling Income per return
20,140
Additional Income
$146,740 In this notice of deficiency, respondent disallowed the following *232 deductions claimed by petitioner, for lack of substantiation: Real Estate Taxes
$4,415.77
State & Local Gasoline Taxes
73.00
General Sales Taxes
286.64
State & Local Income Taxes
167.70
Home Mortgage Interest
39.64
Attorney Fees
300.00
$5,282.75 Respondent then determined petitioner's allowable deductions on the basis of the standard deduction since that resulted in a greater deduction than allowance of itemized deductions. OPINION Petitioner in this case testified that he was paid $375 to $400 a week by the bank as a salary for his services as a pickup man and initially stated he was also paid "a bonus." He testified that the $20,140 was his salary. He stated he kept no records since if he were arrested by the police with any records that dealt with the numbers business he thought he would be subject to being "put in jail." Petitioner called as witnesses two runners who testified that he picked up their slips and the money they had received from their customers and brought them the bills to pay a customer who won. These runners verified the fact that the payoff would be in large denomination bills. While none of the testimony was as precise as *233 it might be, from the testimony of the runners from whom petitioner "picked up" as to the amounts of his pickups, it appears that $166,880 would constitute approximately petitioner's total pickup for the year 1971 after the runners retained their 25 percent commission. Although petitioner, when questioned by the Court as to what he meant by plus "a bonus," stated he was merely referring to vacation pay or something like that, he made no satisfactory explanation of why he had initially referred to such pay as a bonus. When the Court directed petitioner's attention to the fact that while he had testified with respect to the exchange of small bills for large bills being for the bank, no explanation had been given for the $19,600 in small bills used to purchase an official check, and no further explanation was forthcoming. The parties stipulated that when the revenue agent had inquired at the bank for a copy of the check or information as to the payee to whom the check was drawn, the bank had stated that it would be quite difficult to obtain that information for a period as far back as 1971. The record shows that petitioner was buying a substantial number of properties, some in his *234 own name and some in the name of wholly-owned corporations he had organized for the purpose of taking title to the property. From the record as a whole, we find petitioner's testimony very unsatisfactory. However, based on testimony of other witnesses and the inferences from the record as a whole, we conclude that when petitioner exchanged small bills for large bills, he did not retain the large bills for his personal use. No explanation has been given of why the $19,600 exchanged for an official check was not income to petitioner in addition to the $20,140 reported by him on his return as gambling income. Furthermore, these two amounts approximate 25 percent of what we roughly determine to be the net amount picked up by petitioner for the bank from runners. Petitioner took the same chance of arrest in numbers operation as did the runners. While petitioner testified he was paid a "salary," from the record as a whole, we consider it reasonable to conclude that petitioner would have gotten no less percentage of his pickup than the runners did of their sales.On the basis of the record as a whole, we conclude that petitioner had unreported income in 1971 from his work in connection *235 with the "numbers business" of $19,600 and that the balance of the additional income determined by respondent was not an amount retained by petitioner but rather amounts which he turned over to the bank. Petitioner failed to show that he paid any real estate taxes on property which he owned in addition to the $1,016.61 which respondent stipulated he was entitled to deduct as real estate tax payments in 1971. However, from the record, we conclude that petitioner in 1971 paid through withholding $167.10 in New York state and city taxes and is entitled to a deduction for this amount. We also conclude that he is entitled to deduct the $300 paid to an attorney for tax advice and the $39.64 paid as interest on a mortgage. Respondent, at the trial, agreed that petitioner was entitled to deduct general sales taxes of $268.64 if, in fact, such were a proper deduction from a computation of general sales taxes from the tax tables on the basis of his adjusted gross income. Petitioner has failed to establish his claimed deduction for state and local gasoline taxes.Petitioner has offered no satisfactory evidence to show why he is not liable for the addition to tax for negligence for failure *236 to maintain records of his income. His fear of arrest is not a satisfactory explanation since he obviously could keep income records which would not show his connection with the numbers operation. We sustain respondent's determination of the addition to tax for negligence. Decision will be entered under Rule 155. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as amended.↩